MATTHEW J. LOMBARD (SBN 239910)
Law Offices of Matthew J. Lombard
11400 West Olympic Boulevard, Suite 1500
Los Angeles, California 90064
Telephone (424) 371-5930
Facsimile (310) 392-9029
Email: mlombard@lombardlaw.net

Attorney for Defendant
OSEMAH ELHASSEN

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:21-cr-01623-JLS-17 |
| Plaintiff, | **DEFENDANT'S POSITION RE: SENTENCING, WITH EXHIBITS** |
| v. | |
| OSEMAH ELHASSEN, | |
| Defendant. | Sentencing Date: November 15, 2024<br>Court: Hon. Janis L. Sammartino |

Defendant OSEMAH ELHASSEN, through counsel, hereby submits his Position Regarding Sentencing, with Exhibits.

Defendant reserves the opportunity to make additional comments through counsel at the sentencing hearing in this matter.

Date: November 8, 2024

Respectfully submitted:

LAW OFFICES OF
MATTHEW J. LOMBARD

By   /s/*Matthew J. Lombard*
MATTHEW J. LOMBARD
Attorney for Defendant
OSEMAH ELHASSEN

1

# I.

## OVERVIEW AND REQUESTED SENTENCE

On May 2, 2024, Osemah Elhassen pled guilty to one count of Racketeering Conspiracy, a Class C felony, in violation of 18 U.S.C. §1962(d).  He is one of 17 defendants in the indictment.  The conspiracy charge stems from Mr. Elhassen's participation in a scheme to sell hardened encrypted devices to transnational criminal organizations.  He was initially arrested on June 16, 2021 in Bogota, Colombia.  Mr. Elhassen moved to Colombia in 2017 to be close to his two young sons who were living there with their mother, a native Colombian.  He has been in continuous custody since his arrest, first in Colombia and now in California.

On May 17, 2023, Mr. Elhassen arrived in federal custody in the United States.  He did not contest his extradition from Colombia and he waived any legal challenge to it; nevertheless, the process of bringing him to this country was lengthy. Mr. Elhassen is currently housed at Otay Mesa Detention Center in San Diego.  He was earlier incarcerated for nearly two years in the notorious Colombian prison known as *La Picota*, where he was attacked and brutalized by other inmates, leading to his hospitalization, and suffered the additional concern of being in an extremely overcrowded prison while Covid-19 raged around him.  As in the U.S., the prison system in Colombia was especially hard-hit by Covid.  Mr. Elhassen's extremely harsh incarceratory experience in Colombia is detailed later in this memorandum.

Osemah Elhassen is ashamed and embarrassed that at the age of 51, he faces sentencing in a criminal court after a lifetime of prosocial conduct.  Osemah had never been involved in any criminal activity prior to moving to Colombia, and this is the first and only time he has ever been arrested.  He does not use drugs or alcohol and before he moved to South America he had a long and continuous history of gainful employment.  Osemah is a university graduate; by his own account, he is incredulous that he has squandered all the gains he made in his life prior to his fateful move to Colombia.

Osemah especially regrets the impact that his arrest and prosecution have had on his family. His father died while he was in custody in Colombia and he worries now that he will never see his mother again. Osemah's mother lives in Australia and cannot visit him here in California, primarily because of her advanced age.

Osemah's shame and remorse are palpable. He wants nothing more than to try and put his life back together upon his release, but he knows that even after he is released it will be difficult to see his sons because he will be living in Australia with his mother and they will be in Colombia with theirs. Osemah has already lost touch with his sons to a great extent. They were able to visit him only once when he was in custody in Colombia, and he has not had visits from them, or anyone else, since his extradition to the U.S.

Osemah understands that there must be additional consequences for his mistake, on top of those he has already experienced. However, he respectfully submits, through counsel, that adequate punishment does not require substantial further incarceration -- particularly in light of the brutal conditions and physical injury he endured during nearly two years of custody in Colombia. He respectfully submits that a sentence of 45 months imprisonment, which is 3 years less than the Government recommends, would account for the advisory sentencing guidelines outlined in Defendant's Sentencing Summary Chart (filed contemporaneously), and would be "sufficient, but not greater than necessary" to satisfy the sentencing factors enumerated at 18 U.S.C. §3553(a)(2).

## II.

## CIRCUMSTANCES SURROUNDING THE
## OFFENSE/DEFENDANT'S REMORSE

Defendant Osemah Elhassen accepts full responsibility for his unlawful conduct and for the pain and hardship he has caused to everyone, including the members of his family. He feels exceedingly vexed that he jeopardized everything he had worked tirelessly for many years to accomplish, for no other reason than his

own wrongheaded choice to try to make easy money.  He mistakenly thought this would help him escape a desperate situation, but he has only made things immeasurably worse.  Osemah's life will never be the same and he will forever live with the consequences of a foolhardy decision that was utterly avoidable, if only he had exercised better judgement and exhibited more patience.

Osemah makes no excuses for what he has done.  However, he believes, and undersigned counsel agrees, that it is important to offer broader context for his actions that will provide some understanding of the desperation he felt while living in Colombia.  In his letter to the Court (attached hereto at Exhibit A), he states:

> I thank you for the opportunity to speak to you before I am sentenced.  I want you to know my story and hopefully get back to my children as soon as possible.
>
> I am a dual citizen of Lebanon and Australia.  One year after I was born in Australia my parents returned to Lebanon, where I did all my schooling.  In 1999 I graduated from the University of Lebanon, and in 2000, with a professional degree.  I secured a work visa to work in Dubai where I worked for seven years.  I then moved back to Australia to be closer to my brother and his wife, who was from Colombia.
>
> My brother's wife introduced me to her best friend, Diana Carolina Urjuela Castano, who was at the time living in Colombia.  After a year of correspondence over Skype video and other phone calls, we agreed to meet each other in Brazil for a vacation.  I then met her in Colombia to meet her family, where we were engaged. She then came to

Lebanon in 2010 and met my family.

Shortly after we were married and moved to Australia so that I could be near my brother and she could be near her best friend.

The defendant's letter continues:

Over the next two years we had two children, both boys, one and 2011 and one in 2013.  Then unfortunately in 2014, my wife's mother became very ill.  My wife returned briefly to look after her mother in and then returned to Australia.  Two years later, in 2015, her mother was diagnosed with cancer, so once again she took the boys with her to Colombia to be there to care for her mother.  In 2017 my wife informed me that she and the two boys were going to stay with her mother in Colombia to take care of her mother.  She basically wanted a divorce.  She said that she no longer wanted to be living with me in the other places and that if I wanted to see my sons, I had to go to Colombia.

I of course traveled to Colombia so that I could be a father to my sons.  However, I went into depression and anxiety after my divorce and due to my economic situation.  I knew no Spanish and did not have any work.  I only spoke Arabic and English in a country where people speak very limited English.

Judge, I realize the magnitude of my mistake and I will

never forgive myself for committing this crime.  I've been on medication for depression while I was in prison in Colombia and I've continued on medication since I arrived to the USA.

I was offered the job to sell the phones out of desperation to help my kids and survive.  But I knew those phones were encrypted because they were used for illegal activities like cocaine smuggling and money laundering.  And yet I sold them anyway, and that was a horrible wrong decision on my part and the reason that I have been through this long ordeal in prison and my family suffering along with me.

I was in Colombia with my two sons when I was arrested on the street in front of them on June 16, 2021.  All three of us were very traumatized and in shock.  I spent the next 23 months in a Colombian prison, La Picota, where I was a foreigner.  I spoke no Spanish.  I was severely abused and forced to give away my clothes and my money or be killed, I was badly beaten and ended up in the hospital for 27 days, with severe nerve and back injury.

To make things worse, my father passed away in 2022 when I was in La Picota.  He was very sad and worried about me and my kids.  Losing him has been very difficult. This loss combined with the knowledge that my mother is sick and by herself adds to my depression and anxiety. My two boys are now stranded in Colombia with no

1    father…

2

3    I am so sorry Your Honor for my ignorance and lack of

4    judgment during this difficult period of my life.  Please

5    have mercy, and I hope you can send me back to my family

6    as soon as possible to look after them.  I thank the Court

7    and you for your time.

8    Saba Zgheyb manages an optometrist shop in Greenacre, Australia.  Saba has

9    known Osemah for three decades.  She observes in her letter:

10    Everyone that has known Osemah, were shocked about his

11    arrest, as he was never known to do anything to break law,

12    he never had a traffic fine.  Until now I am shocked and

13    cannot believe…

14

15    I believe he is very remorseful, and the guilt from been

16    away from his kids is enough of a punishment for him and

17    I believe he has learnt from his mistakes and will not be in

18    the same position he is now.  His mother is suffering

19    greatly from his incarceration and hoping he will be with

20    her soon to take care of her.

21    In their co-written letter, Osemah's siblings Hamzi and Diah offer:

22    [W]e are both dedicated to supporting Osemah and

23    providing him with the financial and mental support to help

24    in the process of his rehabilitation into society again.  As

25    our mother wrote in her letter, he will be living with her in

26    Australia where he can be her carer and will be entitled for

27    government financial support (i.e. social services).

28

We have been speaking with Osemah via phone calls on weekly basis and one of the things he shared with us was that he has learned from this experience and expressed remorse. Most times we sensed that he was anxious and stressed about his situation, and that he has been experiencing pain in his joints. He also shared with us that he has been managing his anxiety with more reading, meditation and doing work at the prison. We are confident that Osemah will not offend again and we will be working together with him to make sure that he will NOT repeat what he has done.

Osemah's mother Nazha Fara writes:

During his stay in Colombia since 2018 Osemah pretty much relied on me and his late father for financial support. Osemah felt guilty and ashamed having to accept financial support from his elderly parents and was looking for work that does not require extensive communication skills. When Osemah told me that he was selling the phones I didn't think much of it and was glad he found work. We were shocked when we knew that the phones were associated with criminal activity and I wish I advised him otherwise, I wish I continued supporting him financially, this would have been avoided. He is deeply regretful and now realizes that this was a terrible decision that costed him years away from his children and family and had implications on his mental health and wellbeing.

### III.

### COMMENTS ON THE ADVISORY GUIDELINES

In the Plea Agreement, the parties did not stipulate to a total offense level but did agree on a base offense level of 32 [U.S.S.G. §§ 2Dl.l(c) (4), 2El.l(a)(2), 1Bl.3(a)]. The parties also agreed to a two-level enhancement for money laundering [U.S.S.G. §§2Sl.l(b)(2)(B), 1Bl.3(a)] and the three-level adjustment for timely acceptance of responsibility [U.S.S.G. §3El.l].[1] The Government indicated in the Plea Agreement that it will argue for a two-level aggravated role adjustment under U.S.S.G. §3B1.1(c), and that the defendant may argue against this enhancement. This single issue -- of whether or not Mr. Elhassen is subject to a 2-level aggravated role enhancement -- has an outsized impact on the rest of the advisory guidelines calculation in this case. Should the Court find that the aggravating role enhancement does not apply, then Mr. Elhassen would be eligible for the Safety Valve [U.S.S.G. §§2D1.1(b)(18) and 5C1.2] and the concomitant two-level guideline reduction, as well as the 2-level reduction for Zero Point Offender under U.S.S.G. §4C1.1(a). The Government stipulated in the Plea Agreement to recommend a three-level departure for Combination of Circumstances [U.S.S.G. §5K2.0] based on Defendant's Timely Waiver of Extradition from Colombia to the U.S.; Expeditious Resolution of the case once in SDCA; and Full Appellate Waiver.

Putting aside for the moment the question of whether or not Mr. Elhassen occupied a supervisorial role, he clearly satisfies each of the other four elements of the Safety Valve requirements as set forth at §5C1.2(a)(1) to (5). He also meets the remaining nine eligibility criteria for the Zero Point Offender adjustment. Should the Court concur with Defendant Elhassen's position that aggravated role is not merited, then Mr. Elhassen will qualify for both the Safety Valve and Zero Point Offender reductions, yielding a total offense level 24, and a sentencing range 51 to 63 months.

---

[1] Plea Agreement, Page 15, lines 6-28, Page 16, lines 1-10.

A.    *Application of an Aggravated Role Enhancement is Not Warranted for Mr.*
     *Elhassen*

Mr. Elhassen is named along with 16 co-defendants, many of whom clearly had substantially higher culpability than he did.  Based on Ninth Circuit precedent, however, it is understood that the level of relative culpability, by itself, does not necessarily support either an upward or downward role enhancement.

Historically, relevant caselaw in the Ninth Circuit has required evidence that a defendant must have exercised authority or control over another criminally liable participant in order to trigger an upward adjustment for role under §3B1.1.  There is no reliable evidence here that Mr. Elhassen ever exercised the requisite authority, management, or control over any of his co-defendants.  Nor was leadership or supervisorial authority held by him over any other criminally responsible conspirator.  Defense counsel's assessment of Mr. Elhassen's offense conduct is deftly summarized in the PSR:

56.    Defense counsel advised he does not believe an aggravated role adjustment is appropriate for ELHASSEN.  Defense counsel informed that AYIK gave ELHASSEN the job and the contact for Defco (which was reportedly the FBI).  As part of the scheme, the defendant contacted Defco, and they sent him a total of about 40 SIM cards.  AYIK gave ELHASSEN six customers for him to provide with phones. ELHASSEN bought the phones and sent the IMEI numbers to Defco.  Defco subsequently set up a passcode on the phone and sent the passcode to ELHASSEN so he could input it into the ANOM application.  The phone then could be used for encrypted conversations.  The defendant used DHL and Fedex to send phones to clients provided by

AYIK and others. ELHASSEN reportedly did not find or solicit customers.

57.    AYIK's customers paid cash through a family member. ELHASSEN paid out of pocket for the phones, and he would be later reimbursed.  Some paid through the defendant's bank account, and he was also paid in cash. ELHASSEN sold two phones to a man who paid him in Bitcoin.  Defense counsel noted that the government indicated that ELHASSEN sold 30 to 50 phones, but it's the defendant's position that he sold about 30 phones.  He was paid $200 per phone.  The defense estimates that the defendant earned a net income of $3,000 to $4,000 for his participation in the instant offense.  Counsel also pointed out that ANOM sold more than 12,000 encrypted devices, and that ELHASSEN followed instructions from Defco.

58.    Moreover, defense counsel relayed that ELHASSEN never had access to the ANOM portal, whereas others did and could tell the customers how to "wipe" or delete their phones.  If there was a problem with the phones, they had to be sent to Defco.  According to defense counsel, all ELHASSEN could do was pass the phone to the customer after it was set up.  He also communicated with customers. Additionally, defense counsel indicated that the government agent told ELHASSEN to tell people he was ANOM Colombia, and the defendant said that on two occasions.  Furthermore, defense counsel noted that "Dr.

1    Djek" also did work in Colombia selling ANOM phones.

2    The defendant confirmed the above information provided

3    by defense counsel, but he noted that he was told that

4    Defco advised that he would be the Colombian line, and he

5    said to one customer that he was ANOM Colombia.[2]

6    Relevant caselaw requires evidence of leadership or management over other

7 participants to apply the aggravated role adjustment at §3B1.1, which is a higher

8 threshold than merely having an important or integral role in the crime.  This issue

9 was addressed in United States v. Helmy, 951 F.2d 988 (9th Cir. 1991):

10    Consistent with the purpose of Part B, we hold that in order

11    for a defendant to receive an adjustment under Section

12    3B1.1(b) for his role as a manager or supervisor, the

13    defendant must have managed or supervised at least one

14    other participant – that is, a person who is criminally

15    responsible for the commission of the offense.

16    In a decision similar to Helmy, United States v. Hoac, 990 F.2d 1099 (9th Cir.

17 1993) cert. denied, 127 L.Ed. 2d 390, 114 S.Ct. 1075 (1994), the Ninth Circuit took

18 issue with the District Court's two-level enhancement for an aggravating role and

19 remanded for resentencing.  The Court held at pages 1111-1112:

20    We do not believe that the district court, properly applying

21    the Mares-Molina standard, could have found by a

22    preponderance of the evidence that Chan was "an

23    organizer, leader, manager, or supervisor" under §3B1.1(c).

24    At sentencing the government argued that the two-level

25    increase was justified because Chan opened the trading

26    company to export the heroin, reserved a shipping date and

27    arranged for a shipping container, assisted Leung in placing

28

─────────────

[2] PSR, Page 11, ¶¶ 56-58.

the heroin in the cans and loading the shipping container, was promised $50,000-$70,000 by Leung if the shipment was successful, and at the time of his arrest possessed the rental contract and keys for the packing warehouse.  While all of these facts suggest that Chan was perhaps *one of the more culpable defendants*, they do not indicate that he exercised "control over others" or was "responsible for organizing others" so as to justify an increase under §3B1.1(c)…  Organizing the importation…is not the same as organizing other conspirators and does not satisfy Mares-Molina.  (Italics added for emphasis.)

While generally there are now fewer appeals in our Circuit from guideline determinations made by District Court judges, due at least partly to the advisory rather than mandatory character of the guidelines since United States v. Booker, 125 S.Ct. 738 (2005), continuing in recent years the Ninth Circuit has declined to apply the 2-level increase for role unless there is an additional showing that the defendant had "control over others."  See <u>United States v. Pimentel-Lopez</u>, 859 F.3d 1134, 1143-44 (9th Cir. 2017) ("[E]ven a defendant with an important role in an offense cannot receive an enhancement unless there is also a showing that the defendant had control over others") (quoting United States v. Whitney, 673 F.3d 965, 975 (9th Cir. 2012)).

Mr. Elhassen's function in this criminal conspiracy was to act as a distributor of the encrypted communication devices.  He communicated with the suppliers of the phones, and also with customers or prospective customers.  In addition, he did hold conversations with fellow conspirators in which other illegal activities beyond sales of the encrypted phones were discussed, including a plan to potentially transport cocaine.

While all of these activities and conversations were criminal, none of them involved Mr. Elhassen exercising leadership, management, control or authority over other members of the conspiracy.  The act of selling an encrypted device to a customer who intends to use it for illegal enterprise is an arms-length transaction between seller and buyer.  While Mr. Elhassen committed a crime by selling the device knowing it would facilitate unlawful activity, he was simply acting as a middleman or broker.  He did not employ, manage, direct, or exercise any control over the buyer of the device, any more than a cocaine broker has control over a customer who seeks to purchase a kilogram of that drug.  The mere act of selling an illegal item to a buyer is not synonymous with being the manager, supervisor, or leader of that buyer.  Here, the phone buyers were not underlings of Mr. Elhassen subject to his orders or direction.  They did not work for him, nor did they answer to him.  They were free to purchase encrypted communications equipment from a competitor or another source, if they could find it.

The Government cites the case of U.S. v. Maldonado, 215 F.3d 1046, 1050 (9th Cir. 2000) in its moving papers.  That case is wholly distinguishable, however, because Jose Maldonado had two employees working under him to facilitate the drug distribution enterprise, Leonel Lopez-Lopez and Mario Vargas.  Each of the two were clearly subordinate to Maldonado and subject to his authority and control; whereas here, Defendant Elhassen had no other criminally liable participant operating under him or for him.

Based on the relevant caselaw and the facts of this case as set forth in the Indictment, the Factual Basis of the Plea Agreement, and the Discovery provided to defense counsel, there is no preponderance of evidence (much less clear and convincing evidence) that Mr. Elhassen acted as a leader, manager, supervisor or organizer of others in the instant matter.  Accordingly, an aggravated role enhancement is without merit and should be rejected by this Court.

# IV.

## THE EXTREME CONDITIONS OF INCARCERATION WHICH THE DEFENDANT EXPERIENCED IN COLOMBIA ARE A MITIGATING FACTOR

For almost two years Osemah Elhassen was held in custody at La Picota, located in the Colombia's capital city Bogota.  La Picota is one of the largest prisons in the country and Osemah was housed there from the date of his arrest on June 16, 2021 until his transfer to U.S. custody on May 17, 2023.  As detailed below, prisons in Colombia are greatly overcrowded, unsanitary, and notoriously violent.

According to the U.S. Department of State's *2023 Country Reports on Human Rights Practices: Colombia*:

> Conditions in prisons and detention centers were often harsh and life threatening due to physical abuse, overcrowding, inadequate sanitation, poor health care, and lack of other basic services.

The report provides the following details:

> Overcrowding existed in both men's and women's prisons. The governmental National Prison Institute (INPEC), which operated the national prisons and oversaw the jails, estimated prisons and jails were approximately 22 percent over capacity.  According to the Ombudsman's Office, police stations and transitory detention spaces were greater than 50 percent over capacity.  The law prohibited holding pretrial detainees with convicted prisoners, but often this law was not followed.  The practice of preventive detention, in combination with inefficiencies in the judicial system, also resulted in overcrowding.

There were cases where prisons and pretrial holding facilities had inhuman conditions, deficiencies in the supply of drinking water, sanitation, medical and psychological services, and an unreliable supply of medicines.  The unreliable supply of medicines was especially serious in temporary detention centers such as police stations and temporary detention centers of the Attorney General's Office.

Many prisoners faced difficulties receiving adequate medical care.  INPEC's physical structures were generally in poor repair.  The Inspector General's Office noted some facilities had poor ventilation and sanitary systems.  Some prisoners slept on floors without mattresses, while others shared cots in overcrowded cells.

According to the umbrella human rights NGO Coordinación Colombia Europa Estados Unidos, there were allegations prison guards and inmates committed numerous incidents of sexual and physical violence, including gender-based violence.

Physical abuse by prison guards, prisoner-on-prisoner violence, and authorities' failure to maintain control were problems.  Between January 1 and August 8, INPEC reported 22 new disciplinary investigations against 26

1   prison guards for physical abuse and inflicting personal

2   injuries, and one investigation of sexual abuse.[3]

3       While detained and awaiting extradition in Colombia, Osemah was represented

4   by local attorney Diana Cristina Alzate Millan.  In her attached letter written on

5   Osemah's behalf, Ms. Millan describes:

6           La Picota is a Prison and Penitentiary in Colombia, it is a

7           horrible center where the human rights of any human being

8           who is imprisoned are violated, the lack of empathy for

9           their religion and beliefs, was subject to several acts of

10          discrimination by colleagues and conflicts, but he still

11          collaborated with those who asked for help according to his

12          possibilities…

13

14          In Colombia, the country's Prisons and Penitentiaries do

15          not fulfill the function of resocialization of the individual,

16          they are not aligned with international guidelines, respect

17          for guarantees and fundamental rights of personnel

18          deprived of liberty, isolation is brutal, they sleep 6 or 7

19          people in a cell, they are subjected to state abandonment

20          and the lack of political will to guarantee decent conditions

21          for any human being, those deprived of liberty in Colombia

22          are second-class citizens, enormous administrative

23          corruption has made the food in this center prison is not the

24          most adequate or balanced, generating autoimmune

25          diseases in those deprived of liberty. The health conditions

26          are terrible, since pest control is deficient and there are

27   _____

28   [3] https://www.state.gov/reports/2023-country-reports-on-human-rights-
     practices/colombia/#:~:text=Conditions%20in%20prisons%20and%20detention,lac
     k%20of%20other%20basic%20services.

17

1  rodents known as rats up to 40 cm in size, which enter the
2  prisons, prisoner patios and their cells, the supply of
3  drinking water is deficient, in the year 2021-2022 that
4  Osemah was there, there were 2 episodes without water
5  supply in the Prison for three days, this being cruel and
6  degrading treatment since the water it is vital for the
7  cleanliness of the staff, cleaning of the environment and
8  hydration, subject to bad odors due to not being able to
9  drain the toilets, all these bad practices led to Mr. Osemah's
10  health conditions worsening, he contracted a urinary
11  infection which was poorly treated, which became
12  complicated in 2021, generating a cyst in a left kidney,
13  and…he had left pleural effusion and pneumonia due to
14  these pathologies, he was confined for 25 days at the Sur
15  Oeste Hospital in the town of Kenney in the city of
16  Bogotá , where he was treated, according to the medical
17  history that I submitted, he was admitted on September 27,
18  2021 until October 18, 2021, he was admitted with a
19  clinical picture of not being able to walk, and blood in the
20  urine, severe back pain, in the Hospital diagnosed that he
21  contracted a poorly treated urinary infection that had a
22  picture of sepsis compromising several organs and tissues,
23  which warranted his hospitalization.  At this time he was
24  subject to analysis for surgical intervention, which was
25  very worrying for him and this caused him to lose 30 kg of
26  weight, deteriorating his physical and emotional health, in
27  reality he has had a very bad time and it has led to anxiety
28  crises.

While Osemah was in custody these ever-present poor conditions were exacerbated by rampant spread of Covid-19 and inadequate responses to the emergency conditions.  Although Osemah did not contract a serious case of Covid while detained in Colombia, the constant presence of the possibility was an additional anxiety-producing factor throughout his time in custody there, which, when combined with the lockdown restrictions and cessation of normal visitation, created far harsher conditions of confinement than usual.

Finally, Osemah was severely beaten by other inmates at La Picota.  As noted, this is a common and frequent occurrence.  The PSR summarizes:

> Additionally, he has joint and nerve related pain from injuries he suffered while incarcerated at the La Picota Prison in Bogota.  The defendant explained that he was beaten by the Colombian cartel in prison because he would not give them money that they thought he had due to the ANOM arrests being in the news, and he was eventually hospitalized for 27 days.  He was also unable to walk for three months.  The defendant noted that he went through "physical and mental hell" during that time.[4]

The anxiety, isolation, fear, and hopeless desperation that Osemah experienced while in Colombian custody were cruel and unusual -- the result of egregious deprivation and mistreatment which would never be permitted in the BOP or any of its contract facilities.  As a consequence, Osemah now struggles with Post-Traumatic Stress Disorder (PTSD) and likely will for some time to come.  The nearly two years he endured there were unrelentingly punitive and go a long way toward addressing the objective of 18 U.S.C. §3553(a) that the sentence imposed deliver ample punishment ("just desserts") to promote respect for the law, and to deter the offender and others from participating in future criminal conduct.

---

[4] PSR, Page 15, ¶ 93.

It is submitted that consideration should be given at sentencing for the extraordinary circumstance of Osemah having spent an extended period in custody in Colombia -- under extremely onerous circumstances -- while awaiting extradition to California to be prosecuted for a U.S. federal crime.

## V.

## DEFENDANT'S PERSONAL HISTORY AND CHARACTERISTICS FURTHER SUPPORT THE REQUESTED SENTENCE

In Gall v. United States, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented" [Gall at 596-597].

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" Pepper v. United States, 562 U.S. 476 (2011) quoting Koon v. United States, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

In keeping with the above, the following social history information about Osemah is presented to the Court.

A.    Family Background

Osemah Elhassen, 51, was born on December 18, 1972 in Sydney, Australia. He grew up in Btouratij, a small village in Northern Lebanon.  Osemah is the second

of three children born to Hamzi Elhassen, his father, who died in 2022 (one year after Osemah was taken into custody in Colombia) and Nazha Farah, his mother, age 84, who lives in Sydney. Osemah's father was a factory worker who late in life trained in social services and worked part-time as a substance abuse counselor. Osemah's mother was a homemaker for most of her life and now works part-time as a clerk. Osemah's siblings are Hamzi Elhassen, 55, and Diah Elhassen, 48. Hamzi lives in Beruit and works in real estate and Diah lives in Sydney, where she is a nurse practitioner.

B.    Childhood Upbringing and Adolescence

Osemah was a very young child when he began living in Lebanon. He initially lived with extended family there until his parents came back to their homeland from Australia a few years later. Osemah's childhood was marked by the Lebanese Civil War that lasted from 1975 until 1990. Although Osemah's family lived some distance from Beirut and Southern Lebanon, where most of the fighting occurred, he does recall being aware and it being a constant cause for anxiety. Over the course of the war, some 150,000 people were killed while almost a million were forced to flee the country as refugees.

While the roots of the war are sometimes oversimplified as a battle over religion, this is belied by the fact that many families were like Osemah's, whose father was Muslim and whose mother is Christian. Osemah's first language is Arabic, but he began learning English when he was a young child in the village school. Despite growing up in wartime, Osemah has some warm childhood memories of studying and playing volleyball or basketball with friends. His family lived comfortably in a small three-bedroom home and while they did not have a great deal of money, Osemah's father was able to keep food on the table and maintain the household with few difficulties. Osemah lived in Btouratij until he was in his mid-twenties when he left for college.

C.    Education and Employment History

Upon recommendation of a friend, Osemah enrolled at Notre Dame–Louaize, a Catholic university in the town of Zouk Mosbeh about ten miles north of Beirut. He graduated in 1996 with a bachelor's in business administration.  In her letter to the Court, Osemah's mother Nazha recalled:

> Osemah's childhood was a pleasant one, a beautiful and
> enthusiastic little boy, eager to learn and grow.  He is a
> kind and loving brother to his two siblings and family and
> loved his bird pets and dog.
>
> …After finishing high school, Osemah joined Notre Dame
> University in Louaize, Lebanon and graduated with a
> Bachelor of Business Administration in 1997.  Shortly after
> that, he travelled to Dubai, UAE for work.  He initially
> worked at a company called Oasis as a project manager and
> then as a flight attendant with Emirates airlines.

D.    Marriage and Fatherhood

Osemah indicates that in some respects he led a very sheltered life growing up, and he seldom had opportunities to meet women or date.  This changed for him around 2010, when his sister-in-law introduced Osemah to her friend Diana Carolina Urjuela Castano, who was then living in her native Colombia.  Osemah and Diana communicated long distance for about one year and then agreed to meet in person in Brazil.  Things moved quickly after their Brazilian vacation and each went to meet the other's family soon afterward.  Within a short period, they married and settled in Australia.  They have two sons, both born in Australia.   Their sons Karim and Wissam are now 12 and 10 years old and live with their mother in Colombia.

Osemah relocated to Colombia in 2017 to be with his family, after his wife moved back there to take care of her ailing mother.  Diana then elected to stay in her

22

country permanently, and Osemah had no choice but to go there himself if he wanted to be with her and his sons.  Once in Colombia, Osemah and Diana's marriage began to unravel and they eventually grew completely estranged.  It was under these circumstances -- living in a country where he did not speak the language and where he had no contacts apart from Diana, who was not eager to assist him in any way -- that Osemah made the regrettable decision to become involved in the instant offense.

The end of his marriage notwithstanding, Osemah has done his level best to maintain a relationship with his sons under circumstances that could not be more difficult.  When he was in Colombia he saw them often and they stayed with him frequently on weekends.  After he was taken into custody he saw them only once, partly because their mother resisted letting them visit and partly because the prison bureaucracy made it difficult to get approval for them to enter the facility.  Osemah is immensely ashamed and remorseful that his offense behavior has resulted in the creation of such a gulf between himself and his two children.

# VI.

## CONCLUSION

Defendant Osemah Elhassen has taken full responsibility for his crime and has articulated remorse at every turn of these proceedings, particularly in the conversations he has had with his mother and siblings since his arrest, and in discussions with undersigned counsel since his extradition from Colombia.  Osemah is disappointed in himself and profoundly ashamed that he has let his loved ones down.  He understands how inexcusable and short-sighted his actions were, and he knows that there is no one but himself to blame for his troubles.  Whatever sentence this Court decides to impose, Osemah will punish himself for the rest of his days.

Taking the totality of factors present here into account, Osemah Elhassen, through counsel, respectfully requests that the Court impose a term of 45 months imprisonment.  Such a sanction would leaven justice with mercy and would be "sufficient, but not greater than necessary" to satisfy the sentencing factors set forth

at 18 U.S.C. §3553(a).   It would also acknowledge the positive qualities that Osemah demonstrated throughout his life prior to his time in Colombia; the overwhelmingly punitive character of the two years he spent in foreign incarceration; the needs for parenting and support of his two young sons; and the other mitigating factors presented in this memorandum and its attachments.

On a final housekeeping note, Mr. Elhassen, through counsel, would ask the Court to amend the Presentence Report -- specifically at Page 10, ¶52 -- to accurately reflect the time he has been in custody since his arrest in Colombia. Mr. Elhassen was arrested in Bogota on June 16, 2021 on an extradition warrant stemming from the indictment in the instant matter.  He was then detained continuously in Colombia for 23 months -- from June 16, 2021 to May 17, 2023, when he was received into U.S. custody -- based solely on these U.S. federal charges and with no other detainers of any type.  This information can be verified by the United States Attorney's Office.

As such, it should be noted in the Presentence Report (under "Release Status" on Page 2 as well as at ¶52, Page 10) that, as of the current sentencing date of November 15, 2024, Mr. Elhassen will have served 1,249 days in continuous custody that should be credited toward the sentence to be imposed in this matter. Mr. Elhassen, through counsel, requests that this information also be incorporated into the Judgment and Commitment order.

Date: November 8, 2024                Respectfully submitted:


                                      LAW OFFICES OF
                                      MATTHEW J. LOMBARD


                            By        /s/*Matthew J. Lombard*
                                      MATTHEW J. LOMBARD
                                      Attorney for Defendant
                                      OSEMAH ELHASSEN